Argued January 13; affirmed March 22, 1949

# STATE *v.* ANKENY

204 P. (2d) 133

*Ben Anderson* argued the cause for appellant. On the brief were Lord, Anderson & Franklin, of Portland.

*Clarence A. Humble,* District Attorney, of Klamath Falls, argued the cause for respondent. With him on the brief were George Neuner, Attorney General, of Salem, and J. H. Napier and U. S. Balentine, Deputy District Attorneys, of Klamath Falls.

Before LUSK, Chief Justice, and BELT, ROSSMAN, BAILEY and HAY, Justices.

BAILEY, J.

In December, 1946, an indictment was returned against defendant, Lewis Ankeny, by which the grand jury of the County of Klamath accused him of the crime of larceny by bailee committed as follows:

> "The said Lewis Ankeny on the 31st day of July, A. D. 1946 in the said County of Klamath and State of Oregon, then and there being, and the said Lewis Ankeny then and there being the owner and operator of Lewis Ankeny & Co., and the said Lewis Ankeny then and there being bailee of $1676.37, lawful money of the United States of America, a

more particular description of which is to this Grand Jury unknown, all being the personal property of Gus A. Anderson and Veva Anderson, did then and there unlawfully, wilfully and feloniously fail, neglect and refuse to deliver, keep and account for said property according to the nature of his trust; contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon."

The case was tried before the court and a jury. A verdict of guilty was returned and from the judgment on conviction defendant has appealed.

Three assignments of error are set forth in defendant's brief. The first assignment is as follows: "The Court erred in overruling defendant's motion to dismiss the indictment and discharge the defendant in that there is no substantial evidence to support the charge as laid in the indictment." Under this assignment three propositions of law are discussed, to wit:

"I. The State failed to prove that the relationship of bailor and bailee existed between the complaining witness Gus Anderson and the defendant.

"II. The State failed to prove the subject matter of the alleged bailment as in the indictment charged, to-wit: $1676.37 lawful money of the United States of America.

"III. The State failed to prove that the alleged crime was committed in Klamath County, Oregon."

In December, 1945, defendant established an investment and securities business in Klamath Falls. He was licensed by the Federal Securities Exchange Commission and by the State of Oregon to buy and sell corporate stock. According to defendant's testimony in some instances he sold to his customer as principal the stock which he wanted to buy. In other instances

he would act as broker and buy on the market for his customers the stock which they ordered.

On August 1, 1946, one Gus Anderson gave to defendant his personal check for $1,676.37, with the request, as claimed by Mr. Anderson, that defendant purchase for him and his wife 35 shares of stock in Marshall Field & Company. Relating to this transaction Mr. Anderson testified in part as follows:

"Q. Mr. Anderson, did you ever leave any money with the defendant? A. Yes, sir.

"Q. How much, and on what occasion? A. Well, I paid for stock he bought for me, sixteen and some seventy-six dollars, or something like that.

"Q. You placed that money with the defendant, did you? A. Yes.

"Q. What was that money for? A. He was to purchase 35 shares of Marshall Field stock.

\* \* \*

"Q. What was your purpose of turning the money over to the defendant, in the amount of $1676.39, that you have heretofore testified to, represented by state's exhibit # 1? What was the purpose for turning that money over? A. He was to purchase 35 shares of Marshall Field stock.

"Q. And state whether or not he was to pay for it out of that money? A. Yes, he was. I paid him for it, yes.

"Q. When was he to make that purchase? A. Immediately, right away.

\* \* \*

"Q. Well now, you paid that over to him as payment for stock, did you not,—the purchase of stock? You bought stock, that was your understanding, was it not? A. He bought stock for me.

"Q. Well, you bought stock, did you not? A. I gave him an order of purchase.

\* \* \*

"Q. You did not talk to Ankeny about any commission, did you? A. No, I told him to purchase this stock for me.

\* \* \*

"Q. When you turned over this check to Mr. Ankeny, so far as you were concerned, that was his money then to do with as he pleased? You had the stock coming? A. He was to purchase stock for me."

In April, May, or June, 1946, defendant had financial difficulties with Sutro & Company, of San Francisco, which resulted in Sutro & Company selling all the securities which defendant had with them except some oil stock. During August and the first part of September the defendant received from his customers many thousands of dollars for which no stock or securities were delivered by him to them. On the 26th of August of that year Gus Anderson paid to defendant an additional $1,543.83. Anderson testified that with this money the defendant was to purchase for him and his wife 50 shares of Lockheed Aircraft stock. No such stock was ever purchased by the defendant for Anderson and his wife. Evidence was introduced of transactions of like character with six other persons living in Klamath Falls.

Defendant gave this testimony concerning the $1,676.37 transaction with the Andersons:

"Q. Do you want the jury to believe Mr. Anderson and Mrs. Anderson gave you this $1676.37 check, buying short with you? Is that what you want this jury to understand? A. Mr. and Mrs. Anderson bought Marshall Field from me.

"Q. Bought Marshall Field from you? A. That is right.

"Q. How much Marshall Field stock did you own at that time? A. I did not own any.

"Q. Then how could Mr. and Mrs. Anderson have bought Marshall Field stock from you? A. By my merely giving them a commitment. It has been done since dawn in the brokerage business; I did it lots of other times.

"Q. Is it your testimony that Mr. and Mrs. Anderson gave you that money for stock you already had, or gave you that money for which to buy stock for them? A. They gave me money to purchase stock from me, as it plainly says on the invoice.

"Q. Gave you money for what? A. To purchase stock from me, as plainly says on the invoice; that is the printed invoice there, and there is others.

"Q. Did you tell them you have Marshall Field stock? A. I did not.

"Q. Then as far as you know they had no information you had Marshall Field stock of your own to sell? A. Yes, it would have been very unusual if I had.

"Q. Yes, it would have been. A. And it would be unusual for any other dealer. They rarely have the stock.

＊　＊　＊　＊　＊

"Q. Now, did the Andersons—either Mr. or Mrs. Anderson—authorize you to sell this 35 shares of Marshall Field stock short? A. It was not up to them to authorize it.

"Q. You just assumed the prerogative of being able to do that with their money if you wanted to? A. Gus wanted to buy 35 shares of Marshall Field stock and I sold him 35 shares.

"Q. How did you sell him that stock? Did you sell him stock short? A. That is right."

Defendant admitted that he had received the Anderson check for $1,676.37 and had cashed it. During the trial Ankeny's attorney made the following statement: "The fact is Lewis Ankeny operated the place and was responsible for whatever transactions occurred." At

the time of receiving this check, or a day or two thereafter, defendant delivered to the Andersons a confirmation slip in which it is recited that "As principals we have sold to you" 35 shares of stock of Marshall Field & Company for $1,666.87, plus $9.50, New York commission and tax.

There is in the record substantial evidence to support the jury's finding that the Andersons gave to defendant the check for $1,676.37 "for the sole purpose of his purchasing for said Andersons 35 shares of stock in Marshall Field Company." Under the Court's instruction it was necessary for the jury to so find in order to return a verdict against the defendant. It must have found against defendant's contention that he, as principal, sold the stock to the Andersons. The confirmation slip was some evidence that defendant had sold the stock as owner thereof but was not conclusive. The state was not precluded from showing the real transaction. If the check was given to defendant with the understanding that it should be used to purchase certain designated stock for the Andersons then the relationship of bailor and bailee existed between them. *State v. German,* 162 Or. 166, 90 P. (2d) 185.

It was probably difficult for the jury to believe that defendant's customers during the month of August, 1946, turned their money over to the defendant for the purpose of permitting him to gamble with it. As we read his testimony, defendant was of the opinion that the different stocks ordered by his customers would decline in the near future and that therefore he did not buy the stock when it was ordered and was waiting for the market to decline when he was overtaken by financial reverses. He called this selling the stock "short". If the stock did actually decline in value he

was to have the difference between what was paid him for the stock by his customers and what he could actually buy it for on the market. If the stock increased in value the duty would be on him to make up the difference. All this gambling with his customers' money was, according to defendant's testimony, done without their knowledge or consent.

■ In his second proposition of law under his first assignment of error defendant argues that the "State failed to prove the subject matter of the alleged bailment as in the indictment charged, to-wit: $1676.37 lawful money of the United States of America." On the authority of *State v. Cooke,* 130 Or. 552, 278 P. 936; *State v. Ross,* 55 Or. 450, 104 P. 596, 106 P. 1022, 42 L. R. A. N. S. 601 and *State v. Neilon,* 43 Or. 168, 73 P. 321, we hold that this contention of the defendant is without merit. The defendant admits that he cashed the check, and there is substantial evidence to support the conclusion that he misappropriated the money received from it.

■ Nor do we see any merit in defendant's contention that the "state failed to prove that the alleged crime was committed in Klamath County, Oregon." The testimony showed that defendant's place of business was in Klamath Falls, that Anderson took his check to the defendant's place of business in that city, and that he left the check there with instructions to purchase certain designated stock for him and his wife. This check was drawn on the Klamath Falls Branch of the United States National Bank, was deposited by defendant in the Branch Bank of the First National Bank of Portland at Klamath Falls, and was paid to that bank by the Klamath Falls Branch of the United States National Bank. The defendant, according to his

attorneys' statement, "operated the place and was responsible for whatever transactions occurred."

The second assignment of error reads as follows:

"The Circuit Court erred in overruling defendant's objection to and permitting witnesses to answer questions *relating to transactions of a similar character to the transaction which led to the indictment of defendant herein,* particularly, transactions consummated with witnesses H. E. Hauger, Rae Jenkins, Ruth M. Dunn, James Todd, W. E. Palmer and Jessie Lyle." (Italics supplied.)

The defendant then quotes from the testimony of each of these six named witnesses, which we summarize as follows:

Mr. Hauger in the month of August, 1946, bought, through Mr. Ankeny, 100 shares of Idaho-Maryland stock for $358, which stock was never delivered.

Rae Jenkins in the month of July, 1946, bought, through Mr. Ankeny, stock in the Kingsburg Cottonseed Oil Company for $550, which was not delivered.

Ruth M. Dunn in the month of August, 1946, bought 75 shares of National Cylinder Gas stock through Mr. Ankeny for $1,609.06, which stock was not delivered.

Mr. Todd bought stock through Mr. Ankeny on the 5th day of August for $2,620.30 which stock was not delivered.

Mr. Palmer in September, 1946, bought, through Mr. Ankeny, 50 shares of Anaconda Copper Mining, 50 shares of American Steel Foundry, and 50 shares of Allis Chalmers for $5,885.61, and no stock was delivered.

And Jessie Lyle in August, 1946, bought through defendant's establishment 25 shares of National Cylinder Gas stock for $543, including commission, but never received any stock.

The court gave the following instruction concerning the admission of evidence relative to similar transactions, to which no exception was taken:

"You are instructed that the charge to be considered by you is the particular charge alleged in the indictment and that you must confine your consideration to the specific charge in the indictment. There has been evidence admitted in this case of other transactions of a similar nature by the defendant; these have been admitted, and must be considered by you solely, for the purpose of motive of the defendant, or a purpose or design, or for the purpose of showing the absence of mistake. You may consider such testimony in determining whether or not the defendant's contention that his failure, if you should find he failed, under the instructions of the Court, to keep an account, was because of matters over which he had no control; but, if you return a verdict of guilty in this case it must be based upon whether or not the defendant committed the specific crime as alleged in the indictment."

██ In support of this assignment defendant relies on the following cases: *State v. O'Donnell,* 36 Or. 222, 61 P. 892; *State v. Willson,* 113 Or. 450, 230 P. 810, 233 P. 259, 39 A. L. R. 84; *State v. Haynes,* 116 Or. 635, 242 P. 603. In *State v. O'Donnell* it is said: "The rule that evidence of crimes other than that charged in the indictment is inadmissible is subject to a few exceptions, speaking of which Mr. Underhill, in his valuable work on Criminal Evidence (section 87), says: 'These exceptions are carefully limited and guarded by the courts, and their number should not be increased.'" The five exceptions pointed out by Mr. Underhill are summarized in the opinion. The second and fourth exceptions are stated by the court as follows:

"(2) When the commission of the act charged in the indictment is practically admitted by the

prisoner, who seeks to avoid criminal responsibility therefor by relying upon the lack of intent or want of guilty knowledge, evidence of the commission by him of similar independent offenses before or after that upon which he is being tried, and having no apparent connection therewith, is admissible to prove such intent or knowledge, which has become the material issue for trial''.

''(4) When a crime has been committed by the use of a novel means or in a particular manner, evidence of the defendant's commission of similar offenses by the use of such means or in such manner is admissible against him, as tending to prove the identity of persons from the similarity of such means, or the pecularity of the manner adopted by him''.

In the O'Donnell case defendant was indicted for the alleged larceny of a cow and a calf. Evidence was admitted of the defendant taking other calves ''but the testimony fails to show that they were taken at or near the same time, or from the same locality''. It was held that such evidence did not fall within any of the five exceptions noted by Mr. Underhill and therefore the admission of such evidence was reversible error.

In *State v. Willson* it was held that the admission of evidence of a separate crime did not come within any of the exceptions noted in the O'Donnell case, and the court reversed the judgment. In discussing these exceptions the court quoted with approval from *State v. Smith*, 103 Wash. 267, 174 P. 9: ''*  *  * To establish guilty intent, unlawful motive, or criminal knowledge, it is permissible to show that the act charged against the defendant was one in a series of similar ones *  *  *.''

In *State v. Haynes* defendant was charged with the crime of statutory rape and it was held that ''the testi-

mony about the defendant driving the automobile while he was intoxicated, especially after his accomplishment of the sexual intercourse with the prosecutrix, was clearly inadmissible. It was not any part of the *corpus delicti*. Neither was the possession of liquor before the specific act occurred of any relevancy whatever in proving the accusation.''

The following excerpt from 18 Am. Jur., Embezzlement, § 62, p. 608, is, we believe, a correct statement as to the admissibility of evidence of other crimes in prosecutions for embezzlement, and should apply with equal force to prosecutions for larceny by bailee:

> ''The general rule in criminal cases that proof of other offenses is admissible for the purpose of showing criminal intent in the commission of the offense with which the defendant stands charged is applicable in prosecutions for embezzlement. Thus, evidence of other acts of embezzlement committed at or about the same time as the principal offense is competent to show guilty intent—such as a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, the identification of the person charged with the commission of the crime, or absence of mistake or accident.''

In *State v. Cooke,* supra, defendant was charged with embezzlement. Several of the assignments of error were based upon admission of testimony and exhibits touching similar transactions. In disposing of these assignments adversely to defendant the court said:

> ''The alleged errors from number 5 to 23, inclusive, are based on the admission of testimony and exhibits touching other similar transactions introduced and received for the purpose of showing a

criminal intent on the part of defendant Cooke. For that purpose the evidence and exhibits were admissible: Underhill on Criminal Evidence (2 ed.), § 89; State v. Lee Wye, 123 Or. 595, 605 (263 Pac. 60); State v. McClard, 81 Or. 510, 515, 516 (160 Pac. 130); 9 R. C. L. 1295, § 1241; 5 Ency. of Evidence, 144.''

See also 22 C. J. S., Criminal Law, § 688, p. 1109.

Defendant blamed much of his trouble on Sutro & Company. He sought financial assistance from that company and when he was unable to procure it he went to New York City where he registered at a hotel under an assumed name.

The Anderson check, which was drawn on the Klamath Falls Branch of the United States National Bank, was deposited by defendant in the ''Lewis Ankeny & Co. Trustee Account'' in the Klamath Falls Branch of the First National Bank of Portland. The defendant alone was authorized to draw checks on this account. He testified that the check given by the Andersons for $1,676.37 was deposited to his account and that he believed it was deposited to the trustee account. He was then asked:

''Q. Now, if that was your money why did you put it in a trustee account? A. Well, the trustee account was the name that we attached to one account in the First National Bank. It had no special significance.

''Q. There was no special reason for having a trustee account in your business? A. I would not say that, but I'll say that that was the name of the trustee account, some time before that.

''Q. Did you open and maintain that trustee account to keep your own money or other people's money in? A. Both.

''Q. Both your money and other people's money?

And you had a purpose for keeping these various accounts, and, directing your attention to the trustee account we referred to, what was your reason for keeping the trustee account? A. I know what we had in mind originally, which was some nine or ten months prior to that, or not that long—I'll say, seven or eight months; I do not know exactly—we were going to do brokerage as the principal business, and we had in mind at that time of trying to keep things separate, you see.

\* \* \* \* \*

"Q. But it ceased to mean anything one way or another after awhile? A. That is right; it was not used for those purposes then.

"Q. And the fact that you deposited this in the trustee account would not mean anything as far as the nature of that transaction is concerned? A. Not that I know of."

Defendant maintained throughout the trial that the money which he received on the Andersons' check was his own money and that it was not received by him as bailee. Evidence of similar transactions was admissible to show a criminal intent on the part of defendant, 22 C.J.S., Criminal Law, § 686, p. 1100, or as tending to establish a common scheme, plan or system. Op. Cit., § 688, p. 1109. For the limited purposes stated in the foregoing instruction the evidence of the other transactions was admissible. To constitute a crime the act must, except as otherwise provided by statute, "be accompanied by a criminal intent on the part of accused, or by such negligent and reckless conduct and indifference to the consequences of conduct as is regarded by the law as equivalent to a criminal intent." 22 C. J. S., Criminal Law, § 29, p. 84. No error was committed in the admission of evidence of similar transactions.

If evidence is admissible for one purpose the judgment will not be reversed because the court gave the wrong reason for its admission. We need not here dwell on the reasons assigned in the bill of exceptions for admitting evidence of similar transactions since such evidence was admissible on the grounds hereinbefore stated.

Defendant's third assignment of error reads as follows:

"That the Circuit Court erred in failing to give the jury defendant's requested instructions numbered II, II Supp. II-A, II-B, II-C and II-D, and in failing to instruct the jury as requested in paragraphs III, IV and V, and in modifying defendant's requested instructions numbered VI, VII and IX, and in failing to instruct the jury as requested by defendant's requested instruction No. XIV, to-wit: to bring in a verdict of not guilty by direction of the Court."

■ Ten of the foregoing thirteen requested instructions were substantially covered by the instructions given by the court, and therefore we will not discuss them.

Requested instruction II-B reads as follows:

"A bailment is to be distinguished from a sale or debt. If by the contract there is no obligation to restore the specific article, but the bailee is at liberty to return either money or goods of equal value, there is a transmutation of property and the obligation created is a debt not a bailment."

■ As far as the instant case is concerned, that requested instruction is abstract. There is no evidence that defendant was at liberty to return either money or goods of equal value.

Requested instruction II-D reads as follows:

"If you are not satisfied beyond a resonable doubt that the prosecuting witness, Gus Anderson, made a demand upon defendant to deliver up the subject matter of the bailment, then you must find a verdict of not guilty."

Under the facts in the instant case it was unnecessary for Gus Anderson to make demand upon defendant to deliver the Marshall Field stock. See *Kuhnhausen v. Stadelman,* 174 Or. 290, 319, 148 P. (2d) 239, 149 P. (2d) 168, where it is said: "Where conversion by a bailee is charged no demand is necessary when there has been 'a possession maintained in violation of one's contract, an unfulfilled promise to return the goods, a diversion of property from the special purpose for which it was received' ". Citing authorities,

Requested instruction No. VI reads as follows:

"You are instructed that in case you find there was bailment involved in this transaction you cannot find the defendant guilty unless you feel the state has proved the subject matter of the alleged bailment to be identical with the subject matter charged in the indictment, that is, $1676.37 lawful money of the United States of America. If you find the sum to be a greater or a lesser sum, then there is a fatal variance of proof, and you must find your verdict of not guilty."

The first sentence of this requested instruction was covered by the court's instructions. The last sentence was not covered for the reason that there was no contention that the sum involved was either greater or less than the $1,676.37 mentioned.

In discussing the failure of the court to give his requested instructions, defendant says: "In failing to properly define the terms of 'bailment' and 'contract

of sale', and in failing to properly define the term 'lawful money of the United States', the Court left the jury to speculate upon the meaning of these terms and permitted the jury to find a verdict on their own conception of the law, or upon general principles of wrong-doing.'' In our opinion the court did fully and clearly define the terms referred to in the foregoing quotation.

■ Defendant testified that he "had $10,000 in assets here in Klamath County in the brokerage firm'' at the time he was in New York. The jury could, from the evidence, have found defendant guilty of larceny by bailee regardless of the value of the assets of his brokerage firm at the time defendant was in New York or at the time defendant was declared a bankrupt. Defendant did not testify that he had $10,000, or any other sum of money in the bank, when he left Klamath Falls. He did own, as far as the record shows, Acoje Mining stock in a chromite mine in the Philippine Islands for which he had paid about $8,000.

Defendant has had a fair trial. The judgment appealed from is affirmed.

HAY, J., did not participate in this decision.

ROSSMAN, J., dissenting.

One of the assignments of error challenges several rulings which were made over objections interposed by the defendant that permitted six witnesses to testify that they purchased stock in the defendant's office which was never delivered to them. None of these six persons was the complaining witness. The stock they purchased was of such concerns as the Anaconda Copper Mining Company and the American Steel Foundry

Company. In other words, it was stock listed on the stock exchanges and of the kind which dealers in securities make a part of their daily transactions. None of these six witnesses was in any way associated with the complaining witness, and the transactions which they described were separate and apart from the one mentioned in the indictment.

The majority hold that no error was committed when the defendant's objections were overruled and the six witnesses gave their testimony. They say that the testimony given by these witnesses was admissible for the purposes indicated in an instruction which the trial judge gave to the jury. In that instruction the jury was told that this evidence was received "for the purpose of motive of the defendant, or a purpose or design, or for the purpose of showing the absence of mistake." The majority hold: "For the limited purposes stated in the foregoing instruction the evidence of the other transactions was admissible."

The part of the bill of exceptions which delineates what occurred when this evidence was offered says:

> "During the course of the trial the State called a number of witnesses for the purpose of showing that each of them was involved in transactions with the defendant, where each of them had paid the defendant certain sums for the purchase of securities and had not received such securities or had sold or placed securities with defendant for sale and had not received the payment therefor. Defendant objected to the introduction of this line of testimony upon the ground that the same was prejudicial, wholly incompetent, irrelevant and immaterial. The court overruled the objection."

I interrupt the quotation for the purpose of stating that the words which follow, and which give the trial

judge's reasons for his rulings, are in his own handwriting. Thus, there can be no doubt as to the reasons which prompted the reception of the challenged evidence. The handwritten words are:

"for the reason that defendant had withdrawn his objection to a similar transaction with Gus Anderson, and that other transactions were stated in defendant's opening statement."

If those reasons are not sound, the ruling can not be sustained. By glancing over the ruling again it is seen that it says nothing about motive, design or intent.

Gus Anderson, the person mentioned in the quoted words was the complaining witness. After he had testified that he purchased through the defendant 35 shares of stock issued by Marshall Field & Company, he was asked whether or not he had had another transaction with the defendant. The latter objected on the ground of irrelevancy. The district attorney at that juncture stated that the defendant's counsel, in his opening statement to the jury, had "opened up the entire issue here, to the extent of saying that this particular witness bought other—had other transactions with him (defendant)." The transcribed opening statement which defendant's counsel made to the jury is before us. Concerning this other transaction which Anderson had with the defendant, the opening statement says:

"Ankeny sold to Anderson this Marshall Field stock and he gave him a confirmation slip. In fact, he sold him two consignments of stock. He sold him stock that he should deliver in the future, he sold him what is charged in the indictment, $1,676.37 worth of Marshall Field; and he sold him about the same amount in Lockheed Aircraft;—that is not involved here, however."

After defendant's counsel had been reminded of that statement, he said: "I will withdraw my objection." Thereupon Anderson's testimony concerning the Lockheed Aircraft stock was held admissible.

The defendant's withdrawal of his objection to Anderson's testimony concerning the Lockheed transaction certainly could not justify the reception of evidence showing the purported transactions with the other six witnesses whose names were Hauger, Jenkins, Dunn, Todd, Palmer and Lyle. None of those six persons was mentioned in the opening statement. The first reason, therefore, given by the trial judge for the reception of the testimony of those six witnesses fails.

It will be observed that the second reason given by the trial judge for the reception of the testimony given by Hauger, Jenkins, Dunn, Todd, Palmer and Lyle was: "Other transactions were stated in defendant's opening statement." An opening statement is not a rule of evidence. It never justifies the reception or exclusion of evidence. No attorney can render evidence admissible or inadmissible by saying something about it in his opening statement. The statement just made is especially applicable to the trial of criminal cases. I am satisfied that the reasons upon which the trial judge based his challenged rulings can not be justified.

Notwithstanding the recitals of the bill of exceptions, the majority believe that the challenged testimony given by these six witnesses was capable of proving that the defendant had a design, an intent, a motive, and that he was not the victim of an innocent mistake. There is no rule of evidence applicable to criminal cases which is better established than the one which holds that evidence showing an accused's com-

mission of other crimes is never admissible unless it serves a legitimate, material purpose. For instance, in a murder case, no one would think of offering evidence of other purported murders unless they were by chance in a material manner connected with the crime recited in the indictment. Everyone knows that evidence which blackens an accused's character and which makes it appear that he is a scoundrel whose imprisonment will be a boon to all, induces the jury to become reckless in dealing with his defense. However, proof of other transactions sometimes serves a material purpose. For instance, a cashier who daily handled large sums of money and who has been indicted for the embezzlement of one dollar, may try to explain his shortage by saying that he was the victim of an innocent mistake which someone made in entering records. In order to negative that contention and prove that his shortage was intentional, the prosecution may be permitted to prove that he was daily short one dollar in his accounts and thereby show that he was operating under a systematic scheme of embezzlement. Thus, in a case of that kind, evidence of other transactions is capable of proving design, intent, motive and absence of innocent mistake. Those are the elements which the majority say the challenged evidence established in this case; but this is not that kind of case.

In the present instance, it can not be claimed that the defendant's purported transactions with these six witnesses was the result of a criminal plan or design upon his part. Of course, he had transactions with other people; he was in the business of dealing in investment securities, and for close to two years conducted an office in an office building in Klamath Falls. The evidence indicates that he transacted a large

volume of business. The hurtful part of the testimony given by these six witnesses was not their statements that they had purchased securities in the defendant's office, but that the securities were never delivered to them. None of the six witnesses expected to receive the securities overnight, and in at least one of the instances the defendant's office was placed in the custody of a conservator within four days after the purported transaction took place. At least four of these six witnesses had had previous transactions with the defendant and the previous transactions had been conducted to the witnesses' satisfaction. For instance, Mr. Todd testified:

"Q. You had many transactions with him?

"A. Certainly.

"Q. And this was the only transaction where you did not get your stock you bought?

"A. I did not get my stock, no.

"Q. Now, on other occasions that you bought stock from Ankeny, did you ever receive a stock certificate, or were you simply credited on the books?

"A. I received my stock certificate in every case, yes."

It is clear that the six transactions mentioned by the six witnesses whose names I have given differed in no detail whatever from numerous, possibly thousands, other transactions which the defendant had had with customers, except in one particular: in these six transactions he failed to deliver to his customers the stock they had purchased. Manifestly, the majority believe that these six instances show that the defendant had devised a felonious plot to steal his customers' money. When the evidence of these six witnesses was presented, the District Attorney made no claim that

it would show an artifice upon the defendant's part to embezzle his customers' money, and his brief does not contend that this evidence tended to prove that the defendant had formed a criminal design to steal money entrusted to him. With the greatest respect for the majority's view, I express my opinion that, so far as this evidence indicates, his failure to have delivered the purchased stock to these six customers did not show that he had devised a scheme to embezzle money. The six transactions mentioned by these witnesses proved nothing, I believe, except that the defendant was in the business of dealing in securities, and that in these six instances he failed, for some reason which no witness mentioned, to complete the transactions. In the meantime, however, his office was open daily, and, as nearly as can be learned from the record, other transactions were moving along properly.

Although in the quietude of our chambers we can readily see that this evidence proved nothing of a criminal character, yet very likely the jury inferred that since the trial judge permitted these six witnesses to testify, over the defendant's repeated objections, this evidence proved that the defendant's conduct was, in fact, felonious. The majority, referring to this evidence, use the term, "tending to establish a common scheme, plan or system." Since the majority draw that unwarranted inference—which even the District Attorney does not vouch for—the jury must have drawn it also. Possibly the testimony given by these witnesses may show that the defendant was incapable and that, therefore, insolvency overtook him, but it does not prove that he was operating under a criminal machination; and yet its admissibility was dependent upon its

capacity to prove artifice. Unless it proved that fact, this evidence was inadmissible. Since the State offered it, the burden of meeting that requirement rested upon the State. So that there may be no misunderstanding about the character of this evidence, I now quote everything said by one of these six witnesses upon direct examination:

"Q. Will you state your name, please.

"A. Ruth M. Dunn.

"Q. Are you acquainted with the defendant?

"A. Yes.

"Q. When did you first become acquainted with Mr. —

"A. I think about December or January of 1946.

"Q. You transacted business with him in the stock brokerage business?

"A. Yes.

"Q. During the month of August, 1946, did you purchase stock from the defendant?

Mr. Anderson: Same objection.

The Court: Same ruling.

"A. I ordered stock; I paid for it.

"Q. How much stock did you order?

"A. Seventy-five shares of National Cylinder Gas.

"Q. How much did you pay for it?

"A. Twenty-one and one-quarter.

"Q. That would be a total of how much?

"A. There was a New York tax commission on it; I paid that, too.

"Q. Do you know how much, the total amount, that you paid?

"A. Yes, I have my confirmation and cancelled check: $1,609.06.

"Q. Was that stock ever delivered to you?

"A. Never.

"Q. Do you know whether or not his office closed up here in town?

"A. I know it closed.

"Q. When was it closed?

"A. It closed about, I think, about between the 7th and 11th of September.

"Q. Between the 7th and 11th of September?

"A. Yes, sir.

"Q. What year?

"A. 1946."

The testimony given by the other five witnesses was no more favorable to the State than Mrs. Dunn's testimony. In fact, the testimony of at least one of them was less favorable, as I shall now show. This witness was W. E. Palmer. He testified that in September, 1946, he purchased through the defendant 150 shares of listed stocks and paid for them $5,885.61. He also testified that none of the stock was delivered to him. Upon cross-examination the following developed:

"Q. Is it not a fact that four days after you bought this stock you had a conservator appointed to take charge of Mr. Ankeny's assets?

"A. Well, through—,

"Q. Is that not right?

"A. Yes."

Further questioning developed the following:

"Q. Mr. Ankeny was not in Klamath Falls?

"A. No, sir. I never dealt with Mr. Ankeny; I dealt with one of the clerks or bookkeeper.

"Q. Who did you deal with?

"A. The bookkeeper, clerk; office girl, in other words.

"Q. Did you ever buy any stock from Mr. Ankeny?

"A. I never did personally.

"Q. Who was the bookkeeper?

"A. I did not get her name."

Shortly the following examination took place:

"Q. The fact is that you never saw Ankeny, you never saw him at the time you turned this money over to him, to the clerk there, did you?

"A. I did not."

At the time of that purported transaction the defendant was in San Francisco endeavoring to secure capital for his business. So far as the record indicates, he and this witness may have been wholly unacquainted. No effort was made to prove the identity of the person whom Mr. Palmer identified as "the bookkeeper, clerk; office girl, in other words." Unless those loose terms show that that nebulous person was an actual employe of the defendant, the latter had had no connection whatever with this transaction. The majority seemingly sustain the admissibility of that evidence by resort to the following words which defendant's counsel employed in his opening statement: "The fact is Lewis Ankeny operated the place and was responsible for whatever transactions occurred." When those words were spoken defendant's counsel had no reason to believe that the testimony of these six witnesses would be held admissible. I submit that it was inadmissible. At any rate, the majority evidently believe that the act of "the bookkeeper, clerk; office girl", in accepting Palmer's money, is evidence that the defendant was operating under a criminal plan for stealing his customer's funds. I can not concur in that point of view.

Without further review of the testimony given by these witnesses, I express my conviction that it wholly failed to show that the defendant operated his business under a plan or scheme to embezzle his customers' funds.

Possibly the majority, in holding that the evidence

about these six transactions showed the nature of the defendant's intentions, have in mind the burden which rested upon the State to prove that the defendant intentionally failed to account for the money the Andersons had bailed to him. Generally, no conduct is criminal unless it was intentionally pursued; in other words, action taken by a person while he was unconscious or under a hypnotic spell is not deemed intentional. The indictment charged that the defendant was the bailee of $1,676.37 lawful money belonging to Gus A. and Veva Anderson, and that he, as bailee, "unlawfully, wilfully and feloniously" did "fail, neglect and refuse to deliver, keep and account for said property according to the nature of his trust." Section 23-524, O. C. L. A., says:

"If any bailee, * * * shall fail, neglect, or refuse to deliver, keep, or account for, according to the nature of his trust, any money * * * such bailee, upon conviction thereof, shall be deemed guilty of larceny * * *."

The State claimed that the Andersons delivered $1,676.37 to the defendant as bailee under an agreement upon his part to purchase for them 35 shares of Marshall Field stock. The defendant admitted that he received from the Andersons $1,676.37, but denied that it came to him as bailee. He swore that it was paid to him for 35 shares of Marshall Field stock which he, as vendor, sold to them. The nature of the transaction was the sole issue. It will be observed that neither the issue in this case nor the provisions of § 23-524, O. C. L. A., concern themselves with any form of intent, except the common one which is an element of virtually every crime; that is, that the act was performed conciously and not unwittingly. In this case, it was wholly unnecessary, in order to prove intent, to show what

the defendant had done in other transactions. The truth of the matter is, the action he took in other transactions with other people's money had no tendency to show his intention in his dealings with the Andersons.

Without resort to further analysis, I express my belief that error was committed when this large mass of challenged testimony was received. This evidence, of necessity, was prejudicial. Had it not been received, the chances are that the defendant would not have been convicted.

I wish to state another reason for my dissent. I am satisfied that the State failed to prove the charge averred in the indictment. The complaining witness, Gus Anderson, gave the defendant his (Anderson's) check in the amount of $1,676.37 to pay for 35 shares of Marshall Field stock. The defendant at that time had at least four bank accounts in Klamath Falls, one of which was with the Klamath Falls Branch of the First National Bank of Portland. It was entitled thus: "Lewis Ankeny & Company Trustee Account." The defendant deposited Mr. Anderson's check in that account. Approximately a month and a half later the defendant was adjudged a bankrupt and a trustee took charge of his estate, which was worth $10,000.00. There is no evidence that the defendant's trustee account contained less than $1,676.37 when the Trustee in Bankruptcy assumed charge. The State attempted to prove the amount held by the defendant's bank accounts when he was adjudged a bankrupt, but the trial judge ruled that the documentary evidence which it offered was inadmissible. The State, seemingly, had no other evidence concerning the condition of the defendant's bank accounts, and abandoned its efforts after it had met with the adverse ruling just mentioned. As a result

of that situation, the jury had nothing before it, when it retired to deliberate, from which it could determine whether or not the defendant's trustee account possessed $1,676.37 when the Trustee in Bankruptcy took charge. In short, the State presented no evidence that the defendant ever withdrew the Andersons' $1,676.37 from the trustee account or converted it to his own use. The burden of proof rested upon the State, and, in the absence of evidence showing that the defendant withdrew from the trustee account amounts which reduced the balance below $1,676.37, a verdict of guilty was unwarranted.

Anderson conceded that he never demanded of the defendant delivery to him of the Marshall Field stock. Mrs. Anderson did not testify. There is no contention that either of them ever requested of the defendant that he return to them the sum of $1,676.37. Unless he applied the Andersons' money to some unauthorized purpose—and the evidence does not indicate that he did—his guilt was not established. So far as we know, the Andersons' money was still in the trustee account when the defendant was adjudged a bankrupt. The foregoing being the state of the record, the judgment of guilty can not be sustained.

The defendant appears to be a young man. Upon his discharge from the Marines at the close of the late war, he went to Klamath Falls as a stranger and established himself in the business of dealing in securities. I am prepared to believe that he was not adapted to the vocation which he chose, but the judgment of guilty should be affirmed only in the event that he violated § 23-524, O. C. L. A. I do not believe that failure to account for the Andersons' money has been shown. Further, I believe that prejudicial inadmissible evidence was received. I, therefore, dissent.