Argued January 6, reversed February 10, petition for
rehearing denied March 8, 1960

MONTGOMERY *v.* U. S. NATIONAL BANK ET AL

349 P. 2d 464

554

*E. L. Crawford,* Salem, and *Robert H. Huntington,* Portland, argued the cause for appellant The United States National Bank of Portland. With them on the brief were Manley B. Strayer and Hart, Spencer, McCulloch, Rockwood and Davies, Portland.

*W. W. McKinney,* Salem, argued the cause and filed a brief for appellants Selnes.

*Sam F. Speerstra* argued the cause for respondent. On the brief were Rhoten, Rhoten & Speerstra and R. W. PicKell, Salem.

Before McAllister, Chief Justice, and Sloan, O'Connell and Harris, Justices.

HARRIS, J. (Pro Tempore)

Plaintiff, A. J. Montgomery, as assignee for the benefit of creditors of Washington Creamery Co., a corporation (hereinafter referred to as the processor), filed the present suit seeking a declaratory decree and judgment as to the status of certain

turkeys, or the proceeds thereof, upon which the defendant United States National Bank of Portland (hereinafter referred to as the bank) claims a preference or lien by virtue of a certain chattel mortgage. The defendants Arnold Selnes and Erma Selnes, husband and wife (at all times represented by the husband, Arnold Selnes, and hereinafter referred to as the grower) were the mortgagors named in said mortgage, and have adopted substantially the same position as the bank, claiming, as does the bank, that the proceeds derived from the turkeys in the manner hereinafter explained be impressed with a constructive trust in their favor and paid over to the bank and applied on the mortgage obligation of the Selneses to the bank.

The plaintiff assignee seeks a determination that the proceeds of the turkeys be held subject to the claims of the creditors of the processor, now defunct.

From a decree entered in favor of the plaintiff, the defendants have appealed.

In 1954 the grower was engaged in the business of growing turkeys. He was financed by the Willamette Valley Bank of Salem. This financing was continued by the United States National Bank of Portland, North Salem Branch, after it had assumed the assets of the Willamette Valley Bank.

The grower's operations required substantial financing and payment therefor was secured by a chattel mortgage dated August 4, 1954. This mortgage described the turkeys which are the subject matter of this suit. The mortgage contained clauses providing for future financing and for renewal of the obligations secured by the mortgage.

The indebtedness of the grower to the bank was at times renewed and extended, but the mortgage and

another one given on March 14, 1955, were never fully paid, and the indebtedness of the grower was never less than $7,762.63, the value of the turkeys which are the subject matter of this suit.

In the latter part of December, 1954, the turkeys were ready for marketing. The prevailing market price was not satisfactory to the grower.

The grower, on December 28, 1954, had the turkeys picked up by the processor for the purpose of marketing. After being taken to the processor's plant in Silverton, the turkeys were killed and processed by the processor. They were packaged in the processor's warehouse under its name and commingled with the processor's turkeys. The processor, after packing, sorting and grading the turkeys, then delivered them to the Terminal Ice and Cold Storage Co. in Salem, which issued a warehouse receipt to the processor. This receipt and the turkeys were then pledged or hypothecated by the processor to the American Produce Co. in Portland, which paid the processor advances thereon of from 70 to 80% of the market value of the turkeys. This was an amount more than twice in excess of the processor's charge of about 9 cents a pound for the processing of the turkeys.

Early in 1955 the processor became financially unable to operate and made an assignment for the benefit of creditors to the plaintiff assignee.

The grower and the bank contend that the arrangement with the processor when the turkeys were turned over to it was that the turkeys were to be killed, processed and stored by the processor until such time as a satisfactory price could be obtained. Their claim is that the transaction was a bailment, and that the pledge or hypothecation of the turkeys to the American Produce Co. by the processor consti-

tuted a conversion, and that the proceeds of the turkeys in the hands of the American Produce Co. should be impressed with a constructive trust in their favor to the extent of the sum of $7,700.

The plaintiff assignee claims that the transaction in question constituted a sale, and that the processor was free to deal with the turkeys as its own property.

During the trial the parties stipulated that the value of the turkeys was 24 cents a pound, or a total of $7,700, at the time they were turned over to the processor by the grower. Likewise, the parties stipulated that the American Produce Co. withhold $10,000 of the proceeds derived from the turkeys to be distributed as the court might direct. This money is now held by the county treasurer of Marion county, Oregon.

The principal questions for our decision, as we view the record, are whether the transaction mentioned was a sale or a bailment and if a bailment, whether the turkeys of the grower, or the proceeds thereof, can be traced to the proceeds against which defendants assert a lien or claim should be impressed with a constructive trust in their favor.

At the conclusion of the trial the court stated:

"Gentlemen, I will tell you what my thinking is on this factually, * * *. I do not mean to bind myself at this time, but my thinking is that there was no sale of the Selnes' turkeys to the Washington Creamery Company."

Later, in a memorandum opinion, the court ruled as follows:

"The Court in this decision will consider the question of sale first: Counsel are aware that the Court fully heard the testimony in another case involving the same transaction which is the basis

of this suit. The Court cannot help but be aware of the jury's decision in the other case referred to, and perhaps to some extent this decision may influence the thinking of the Court. It cannot be denied the same issue was presented to and decided by a jury in the previous case and on a question of fact the Court cannot say that its judgment is better than that of twelve laymen. It, therefore, appears to the Court that the transaction between the defendant Selnes and the Washington Creamery Company was a sale.

*"I think the evidence was clear at the time the turkeys were delivered to the Washington Creamery Company, it was not the intention of defendant Selnes to consummate a sale at that particular time.* Subsequent dealings between the parties, however, culminated at a later date in a sale at an agreed price of 24 cents a pound.

"It is interesting to note that the brief of the defendant, page 8, beginning on line 5, states:

" 'It is obvious that no sale was intended by either party at the time of the delivery. This follows from the fact that there had been no agreement on price and no commitment by Shoemaker to pay any price. He offered and Selnes refused a price of 23 cents, and the turkeys were stored at Shoemaker's suggestion to await a rise in the market. It is obvious that there could be no sale until the parties had agreed upon price, an event which might never occur.'

"And then on page 11, the brief requests the Court to impress a trust in the amount of $7,792.63, 'the same being the agreed value of the Selnes turkeys at 24 cents a pound.'" (Emphasis supplied.)

The "agreed value" quoted by the court from the bank's brief was the value, heretofore referred to, which was based on a trial stipulation of the parties,

fixing a price to enable the court to determine the value of the turkeys.

It will thus be noted that at both times the trial judge expressed his views upon the facts, he held that at the time the turkeys were delivered to the Washington Creamery Company it was not the intention of the defendant Selnes to consummate a sale at that particular time.

ORS 75.010(2) provides:

"A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price."

It is undisputed that there was no agreement concerning price when the grower turned over the turkeys to the processor. The arrangement for processing was made orally between the grower and Mr. Shoemaker, president of the Washington Creamery Company. On prior occasions when the processor had purchased turkeys, the price was agreed upon at the time of the slaughter. In fact, a week or two before the instant transaction the processor had purchased some hens from the grower on a cash basis.

Shortly before the turkeys in suit were delivered, Mr. Shoemaker and the grower had discussed the market. The grower testified as follows:

"Q What did you tell him?

"A I asked him if he didn't think there would be a better price later and he said that probably in a couple of months the market would strengthen and it would be no trouble getting 25 cents, so I told him to put them in storage and hold them for me until such time as we agreed on what the price would be."

Mr. Shoemaker's version of the transaction follows:

"Q Now, the turkeys in question in this law-

suit, Mr. Selnes came into the plant of Washington Creamery Company sometime, I believe, in December of 1954. Do you recall that occasion?

"A. I don't recall the occasion. I recall he did come in, yes.

"Q. Had you had any other transactions with Mr. Selnes about that time?

"A. I purchased some hens out of his flock, probably a week or two before that, for cash. And we slaughtered his toms.

"* * * * *

"Q. Now, Mr. Shoemaker, tell us about the transaction in December of 1954 between you and Mr. Selnes.

"A. Well, Mr. Selnes was in to see me before Christmas and told me he had these turkeys for sale, and I suggested that his hens should be moved right away for the Christmas market, and the toms market wasn't good and we couldn't pay much money for them, that he might try to put extra weight on them and we would kill them after Christmas, so we took his hens in before Christmas, and we purchased his toms and slaughtered and packaged them up and put them over in the warehouse under our own name, in our lot numbers, and commingled them with our own turkeys. Mr. Selnes came in several days later and wanted to know what we were going to pay for the other turkeys and I told him 23 cents was all I could pay; however, I said it would indicate the price might be better in a week or two, or on a future day, and if he was willing or was able to wait for his money, we would probably be able to do better for him a little later, and he at that time decided he would like to do that if the bank would let him. He said he would talk to the bank and let me know, which he did several days later. He let me know the bank said he could hold them for a while in the hope of getting a better market price."

It will be noticed that Mr. Shoemaker's statement "* * * we purchased his toms * * *" is a con-

clusion rather than a statement of facts out of which a sale would arise. However, his statement that "He let me know the bank said he could hold them for a while in the hope of getting a better market price" indicates that it was the understanding that the processor was to hold the turkeys for the account of the grower.

Mr. Shoemaker also testified:

"Q   Were any instructions given to you at the time of the delivery of these turkeys to you with respect to the disposition of them?

"A   No.

"*   *   *   *   *

"Q   Was there any discussion of what you would pay?

"A   I told him 23 cents I would pay at the time or a warehouse receipt for the turkeys upon payment of the processing charges and would show me a profit that I anticipated in making out of that purchase, and they said if they could get 24 cents they would rather have the money."

The fact that Mr. Shoemaker was willing to give a warehouse receipt to the grower if he was unwilling to sell at 23 cents a pound is not consistent with his claim of purchase and passage of title to the turkeys to the processor.

Indicative of the fact that Mr. Shoemaker believed he had only an equity in the turkeys (as opposed to legal title) resulting from the processing charges is his following statement:

"Q   Is that when these birds were placed in storage, you had that equity in the birds, you had that much advanced on them?

"A   I had invested that much in them, yes.

"Q   That is the cost of killing, processing and preparing them?

"A   Yes.

"Q   And storing them?

"A   That is right.

"* * * * *

"Q   In connection with that conversation, you did agree that if he wanted a warehouse receipt you would give him one?

"A   Absolutely if they would pay me my processing charge."

If the processor had acquired legal title to the turkeys as a result of the transaction, it would have had an unquestioned right to pledge and borrow money on them as it did. However, referring to a time after the processor actually borrowed money on the turkeys, Shoemaker testified:

"Q   Now, in response to that question Mr. Meeks asked you. *'Did you convert Mr. Selnes' money to some other use?'* You answered, *'I guess that is right.'*

"A   I believe that it right." (Emphasis supplied.)

1. The fact that the turkeys were placed in a common mass is not inconsistent with retained ownership in the grower. In fact, such ownership is presumed. *Savage v. Salem Mills Co.,* 48 Or 1, 16, 85 P 69.

The record also indicates that at the time the processor pledged the turkeys it had full knowledge of the bank's lien. Mr. Shoemaker testified:

"Q   When did you learn he had borrowed money against these turkeys?

"A   I believe the first I knew of it was—It was common practice. I knew it. Everybody knows it. Everybody does it.

"Q   I want to know what you know about it in this case.

"A   I think the first time I knew about it for sure—We had been writing checks. We knew it when we paid him for the hens.

"Q You knew it before he brought the turkeys into the plant then?

"A That is right.

"Q Did you know who they were mortgaged to?

"A Yes, Sir.

"Q Was that the bank?

"A Yes, Sir.

"Q Now, after you had processed these turkeys and put them in lots of cold storage, you sent them to Portland and borrowed money against them, is that right?

"A Very probable."

■ Plaintiff assignee relies upon the proposition that a contract to sell goods may be made in writing, by word of mouth, or may be inferred from the conduct of the parties (ORS 75.030); also, that the price may be fixed by contract or may be left to be fixed in such manner as may be agreed or it may be determined by a course of dealing between the parties (ORS 75.090).

This is true, but in this case the only prior course of dealing or conduct between the parties was a sale on a cash basis.

Plaintiff also relies on custom or usages of the trade to support his contention that the transaction was a sale. Plaintiff quotes from the testimony of Mr. Montgomery as follows:

"Q Are you familiar with any arrangement or processing custom or dealing with growers whereby the processor takes the turkeys when the grower is unable to pay the processing charges and so forth?

"A Yes.

"Q And no ready market for the turkeys.

"A Yes, I know of that arrangement.

"Q Tell us what the general custom in the business is on that.

"A Where the grower has been unable to pay the processing charges or not in a position to do it at the time the turkeys are processed and ready for storage, it has been quite customary from my experience to find the processing plant storing them in their own name."

The only custom which the foregoing testimony tends to prove relates to a situation wherein the grower is unable to pay processing charges and as a result the processor then stores the produce in his name.

There is no testimony herein that the grower was unable or unwilling to pay the processing charges. The evidence also shows that the processor went far beyond storing the turkeys in its own name, which is presumably for security of the processing charges.

Moreover, the answer of Mr. Montgomery incorporates his own personal experience and does not refer to a custom actually known to the grower or so widespread or universal in the trade that it must have been constructively known by the grower.

■ In *Shaw Wholesale Co. v. Hackbarth,* 102 Or 80, 101, 198 P2d 908, 201 P 1066, we held:

"It is claimed that these provisions which were inserted in the attempted acceptance conformed to the general custom and usage pertaining to the business of selling lumber and that they would be implied as a part of the offer.

" 'To be regarded as a part of the contract the usage or custom must not only be shown to exist, but it must have both of the following elements: (1) It must be actually or constructively known; and (2) it must be consistent with the contract.' 4 Page on Contracts (2d ed.), § 2057."

■ If at the time of the delivery of the turkeys to the processor they had become subject to its disposal and to deal with as its own property, title then would have passed to the processor, and the transaction would have been a sale. The presumption is that title remains in the owner (grower). *Savage v. Salem Mills Co.*, supra, at p 16. It, therefore, was incumbent upon the processor to show that the turkeys became subject to its disposal. Such proof, if available, could be made either by showing the terms actually agreed upon and the circumstances and conditions surrounding the transaction, or by proof of a usage, custom and regular course of business which would have entered into and would have become a part of the contract of the parties. It would have been necessary to show that such custom, usage and general course of business were such that when the turkeys were delivered, the processor could thereafter, at its own convenience and pleasure and without any further authority from the person delivering the turkeys, sell and dispose of them for its own account and benefit. Had it been proved that such custom and usage and general course of business existed, the transaction would have constituted a sale and not a bailment. *Savage v. Salem Mills Co.*, supra, at p 24.

In the Savage case, supra, it is to be noted that the court in its findings of fact found that at all times alleged it was the usage, custom and usual course of business between the mill company and all persons delivering wheat to it, well known to and habitually acted upon by the mill and all such persons, for the mill, after delivery was made, at its own convenience and pleasure, without any authority from the party delivering the wheat, to ship it out of the common mass of the wheat in the mill, to grind the

wheat and to sell it for the account and benefit of the mill company. The court held that in the absence of an express agreement to the contrary, this usage or custom entered into and formed a part of the contract made by the mill and those dealing with it, with knowledge of such custom and usage. *Savage v. Salem Mills Co.,* supra, at p 11.

In this case the processor relies to some extent upon the fact that the receipt handed to the grower at the time of delivery contained the words "bought of." The presence of these words in the receipt, however, is not controlling. In the Savage case, supra, the court stated:

"* * * The words 'in store,' used in the receipt are not controlling as to the nature of the transaction, as appears from the authorities referred to hereafter.

"* * * * * *

"* * * It cannot, by inserting into its receipt some clause or clauses which, standing alone, are inconsistent with the sale, change the entire nature of the transaction and make a bailment out of what, in law or in fact, was a sale or exchange." *Savage v. Salem Mills Co.,* supra, at pp 12, 22.

Asserted custom and usage are of no avail to the plaintiff upon the issue of sale or bailment under the record in this cause.

From the foregoing we find, as did the trial judge, that the arrangement made at the time the turkeys were delivered to the processor late in December, 1954, consisted of a bailment by the terms of which they were to be killed, processed, stored and held by the processor for the grower. *State v. Ankeny,* 185 Or 549, 204 P2d 133; *Moore v. Shell Oil Co.,* 139 Or 72, 6 P2d 216; *State v. You,* 20 Or 215, 25 P 355.

Instead of holding the turkeys for the grower, the evidence is conclusive that the processor treated them as if they were its own property. After commingling the grower's turkeys with its own, a part of the commingled mass, lot 790, containing part of the grower's turkeys was transferred to a man named Walker and all other lots into which the grower's turkeys had been placed were hypothecated and pledged to the American Produce Co. to secure advances of about 20 cents a pound upon a representation by the processor that the turkeys were not encumbered. By this conduct the processor placed the turkeys beyond its power to return them. This consisted of complete denial by the processor of the property rights of the grower and the bank.

> "* * * a conversion is 'any distinct act of dominion wrongfully exerted over one's property in denial of his right, or inconsistent with it', and 'in order to maintain an action for conversion, there must have been, on the part of the defendant, some unlawful assumption of dominion over the personal property involved, in defiance or exclusion of the plaintiffs' rights, * * *." *Williams v. International Co.*, 172 Or 270, 278, 141 P2d 837.

Also see *In re Salmon Weed & Co.*, 53 F2d 335, 338, 79 ALR 379.

■ Plaintiff contends that no demand was made for the return of the turkeys. In this case no demand was necessary to maintain a claim of conversion because the conversion had already occurred. *Kuhnhausen v. Stadelman*, 174 Or 290, 319, 148 P2d 239, 149 P2d 108.

The heretofore-mentioned acts of the processor clearly constituted a conversion of the turkeys. Moreover, the acts of conversion all occurred prior to February, 1955, when it is claimed a price of 24 cents

a pound was agreed upon. In fact, the grower did not authorize the processor to attempt to sell the turkeys until February 4, 1955.

■ In *McCarthy v. General Electric Co.*, 151 Or 519, 524, 49 P2d 993, this court held that if converted goods are even returned to the owner and accepted by him, it will not cure the conversion or be a bar to an action for conversion. A fortiori we hold that under the circumstances of this case, the processor, after having committed a conversion of the turkeys by pledging and hypothecating them to third persons, is estopped to claim that subsequent to the conversion which remained unknown to the grower, terms of sale relating to the converted property were negotiated, which would bind the grower. Otherwise stated, the processor is estopped to claim that property wrongfully hypothecated and pledged by it to third persons without the knowledge of the owner can be the legitimate subject matter of a sale between itself and the grower. It must be remembered that subsequent to the conversion the turkeys were then under the dominion and control of Walker and the American Produce Co. How could the grower at such time make delivery or pass title?

> "The rules applicable to other forms of contract, discussed in Contracts §§ 132-188, ordinarily apply to, and control questions of, the validity of assent to a contract of sale; and in accordance with these rules a contract of sale is not valid and binding where, although there is apparent assent thereto, such assent of either one or both of the parties is *unreal* or invalid." (Emphasis supplied.) 77 CJS 657, Sales § 35.

Therefore, it is unnecessary for the court to pass upon the February dealings of the parties in relation to the issue of a sale.

■ There remains for disposition the claim of the plaintiff that the turkeys were commingled with other turkeys of the processor, and that the identity of the turkeys was lost, rendering it impossible to identify them for the purpose of impressing a constructive trust or lien upon them or their proceeds.

While, of course, the individual turkeys cannot be traced, it appears that after the grower's turkeys were commingled with other turkeys of the processor, a part of the commingled mass was delivered to the American Produce Co. A portion of the commingled mass received by the American Produce Co. included more turkeys than those herein involved. It also appears that the funds paid into court were part of the proceeds from the sale of that part of the commingled mass delivered to the American Produce Co.

We find that the grower and the bank have sufficiently traced the turkeys delivered to American Produce Co., or their proceeds, to support their claim of a lien thereon. *School District 62 v. Schramm,* 142 Or 296, 301, 304, 20 P2d 241; *Ayre v. Hixson,* 53 Or 19, 98 P 515; *Ferchen v. Arndt,* 26 Or 121, 126, 127, 37 P 161; *Equitable Trust Co. v. Connecticut Brass and Mfg. Corp.,* 10 F2d 913, 914, 915.

Plaintiff relies on *Shute v. Hinman,* 34 Or 578, 56 P 412, 58 P 882. However, in the Shute case the trustee deposited trust funds to his credit by making a general deposit in a bank where the credit was used by the bank in the regular course of business, so that the identity of the trust fund was wholly lost. The owner was unable to trace his property or to show that it went into or remained a part of the mass. In the instant case we find that defendants have traced the turkeys into specific lots which were turned over to the American Produce Co., and that

the funds on deposit consist of proceeds of the sale by the American Produce Co., as agreed to by the parties in the manner heretofore indicated in this opinion.

In *Ferchen v. Arndt,* supra, cited by the plaintiff, the court stated:

> "Within the principles announced by these authorities the petitioner is not entitled to relief upon the facts stated in his petition, because it is not shown that the fund paid into the court by the receiver and awaiting distribution includes any of the proceeds of the trust property, or forms any part thereof. The admitted facts show that the moneys derived from the sale of the interventor's [sic] property has been used in the payment of debts, and otherwise dissipated, so that such moneys can no longer be traced, or shown to form any part of the fund which is sought to be charged with a preferred lien."

While, as stated by the court in Ferchen, the proceeds from the sale of petitioner's property had been dissipated; in the case at bar the fund has been identified as the proceeds from a sale of part of the whole commingled mass into which the grower's turkeys were originally placed. With the exception of lot 790, the portion of the mass sold by American Produce Co. included all the lots into which the grower's turkeys were placed.

■ The fact that subsequent to the commingling of the grower's turkeys with others by storage in running lots in the Terminal Ice and Cold Storage Co. in Salem, lot 790, into which a portion of the grower's turkeys were originally placed, was transferred to one Walker will not prevent a trust from being impressed upon any part of the property contained in the commingled mass or proceeds from the sale thereof to

the extent of the value of the property traced into the mass. The presumption is that the withdrawal or transfer to the Walker account was made from the processor's own portion, rather than from the grower's.

> "* * * Equity gives the claimant a lien upon the mingled fund and upon every part of it regardless of the intention of the wrongdoer when he separates the funds by making withdrawals." IV Scott, Trusts (2d ed) 3304, § 517.1.

Also see *School District 62 v. Schramm,* supra, at p 301.

Since we find that the transaction under consideration was as a matter of law a bailment, that there was a conversion by the processor of the turkeys in question, and that as a result thereof the grower and the bank are entitled to a declaration of a constructive trust in their favor upon the proceeds on deposit, as their respective interests may appear, it is not necessary to consider the other interesting questions which have been presented by the briefs.

The decree of the circuit court will be reversed and the case remanded for an entry of decree in conformity with the respective prayers of the answers of the defendants, United States National Bank of Portland, and Arnold Selnes and Erma Selnes, husband and wife.

In the decree plaintiff will be given credit in the sum of $1,552.59, which constitutes a pro rata payment paid into court during the course of the trial for the account of the defendants.